**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-0309-23

STATE OF NEW JERSEY,

    Plaintiff-Respondent,

v.

JOVY DELPHINE, a/k/a
FRANTZ DEOPHIN,

    Defendant-Appellant.

_____

Argued December 10, 2025 – Decided March 5, 2026

Before Judges Currier, Berdote Byrne and Jablonski.

On appeal from the Superior Court of New Jersey, Law Division, Atlantic County, Indictment No. 22-09-1414.

Emma W. Pallarino, Assistant Deputy Public Defender, argued the cause for appellant (Jennifer N. Sellitti, Public Defender, attorney; Emma W. Pallarino, of counsel and on the brief).

John J. Santoliquido, Deputy Attorney General, argued the cause for respondent (Matthew J. Platkin, Attorney General, attorney; John J. Santoliquido, of counsel and on the brief).

PER CURIAM

Following his guilty plea for second-degree unlawful possession of a weapon, defendant Jovy Delphine appeals from a Law Division order denying his motion to suppress evidence. We conclude the investigating officer's knowledge of the vehicle in which defendant was riding and the absence of valid registration corroborated a reasonable belief that a motor vehicle violation had occurred. This justified the motor vehicle stop which led to the subsequent search and seized evidence supporting his conviction. Accordingly, we affirm.

I.

The following facts were elicited during the testimonial hearing on defendant's motion to suppress. On the evening of July 3, 2022, Officer Matthew Talavera of the Atlantic City Police Department was on patrol on Atlantic Avenue in his vehicle. Officer Talavera noticed a gray BMW consistent with the description of a vehicle he knew to frequent the area, typically driven by a male whose driver's license was suspended. The officer testified he had seen that suspicious vehicle earlier in the day. He also knew the driver often changed the vehicle's license plates.

2

According to Talavera, when he saw the vehicle, he believed it was leaving an area known for drug distribution. From his distance, Talavera could not identify the gender of the driver. Talavera entered the vehicle's Pennsylvania license plate number into his mobile data terminal (MDT). The result of that inquiry was "no record found" which, according to the officer, indicated that the vehicle was either not registered or that the license plates were counterfeit. Dispatch similarly returned a "no record found" designation. As a result, and since Talavera believed the vehicle was not registered or that the license plates were false, he stopped the car.

Talavera approached the vehicle and ordered the driver to turn it off, roll all the windows down, and produce driving credentials. Two people were seated in the in the front and three in the back. The driver appeared nervous and was shaking her leg. She handed Talavera a stack of papers pertaining to the vehicle. None, however, included the requested driving credentials.

Defendant was seated behind the driver. None of the passengers were wearing seatbelts. None of the occupants could produce registration information for the vehicle. Talavera then inquired as to the owner of the vehicle and defendant answered that his mother was the owner. Seeking to substantiate that information, Talavera asked for defendant's identification.

3

Defendant responded that he did not have identification with him. Talavera radioed dispatch with the vehicle identification number (VIN). Talavera went back to his police vehicle to check the VIN himself. Another officer informed him that the car was registered to an Augusta Nicholas- information later determined to be defendant's mother and correct. Talavera attempted to verify that information independently. When he did so, Talavera's MDT was inoperable. However, dispatch reported that no record was found upon searching the subject vehicle's VIN. Talavera returned to the subject vehicle and asked defendant again whether he had any documentation which could establish his identity. Defendant answered that he did not. Talavera asked for defendant's name and date of birth. Defendant replied that his name was Franz Delphine, with a date of birth January 6, 1995.

Talavera ordered defendant and the remaining passengers to exit the car. A pat down revealed a loaded 9mm handgun on defendant's person, and controlled dangerous substances (CDS) and ammunition were found in the car. Later, police discovered defendant's name was in fact Jovy Delphine, with a date of birth inconsistent with the one he offered at the scene. There was a warrant for defendant's arrest from Pennsylvania, for strangulation.

A-0309-23

A grand jury returned an indictment for second-degree unlawful possession of a weapon, N.J.S.A. 2C:39-5(b)(1); second-degree possession of a firearm while committing a CDS crime, N.J.S.A. 2C:39-4.1(a); second-degree possession or distribution within 500 feet of certain public property, N.J.S.A. 2C:35-7.1(a); third-degree possession CDS, N.J.S.A. 2C:35-10(a)(1); third-degree possession of CDS, N.J.S.A. 2C:35-5(b)(3); fourth-degree possession of hollow nose or dum-dum bullets, N.J.S.A. 2C:39-3(f)(1); third-degree hindering, N.J.S.A. 2C:29-3(b)(4); second-degree certain person not to have a weapon, N.J.S.A. 2C:39-7(b)(1); first-degree unlawful possession of a weapon after serving a prior No Early Release Act sentence, N.J.S.A. 2C:39-5(j). Defendant was also indicted on five counts of fourth-degree possession of large capacity ammunition magazine, N.J.S.A. 2C:39-3(j).

Arguing Talavera's initial stop of the motor vehicle was unlawful, defendant moved to suppress the evidence seized from his person and from the vehicle. In a comprehensive fourteen-page written decision, the court denied his motion.

On July 3, 2023, defendant pled guilty to a single count of unlawful possession of a weapon in exchange for a five-year prison term, subject to the

Graves Act, N.J.S.A. 2C:43-6. Defendant reserved his right to appeal the denial of his motion to suppress. R. 3:5-7(d).

Defendant appeals and raises a single issue for our consideration:

> The evidence should have been suppressed because the car stop was illegal where a State records search returned the incorrect result that the car was unregistered.

## II.

Our review of a trial court's suppression ruling requires we "defer[] to the trial court's factual findings" and uphold them if they are supported by "sufficient credible evidence in the record." State v. Nelson, 237 N.J. 540, 551 (2019). Consequently, we will only disturb a trial court's finding if they are "so clearly mistaken that the interests of justice demand intervention and correction." State v. Robinson, 200 N.J. 1, 15 (2009) (quoting State v. Elders, 192 N.J. 224, 244 (2007)). In contrast, we review the trial court's interpretation of the law and the legal "consequences that flow from established facts" de novo. State v. Gamble, 218 N.J. 412, 425 (2014).

These substantive legal principles govern this appeal. "The Fourth Amendment of the Federal Constitution and Article I, Paragraph 7 of the New Jersey Constitution guarantee the right to be free from unreasonable searches and seizures." Nelson, 237 N.J. at 552 (citing U.S. Const. amend IV; N.J.

6

Const. art. I, ¶ 7). "Our jurisprudence under both constitutional provisions expresses a preference that police officers secure a warrant before they execute a search." State v. Witt, 223 N.J. 409, 422 (2015). "Warrantless searches are permissible only if 'justified by one of the "few established and well-delineated exceptions" to the warrant requirement.'" Ibid. (quoting State v. Frankel, 179 N.J. 586, 598 (2004) (quoting Mincey v. Arizona, 437 U.S. 385 (1978))). "[T]he State bears the burden of proving by a preponderance of the evidence that [the] warrantless search or seizure 'falls within [an] . . . exception . . . .'" Elders, 192 N.J. at 246 (quoting State v. Pineiro, 181 N.J. 13, 19-20 (2004)).

Defendant narrowly framed the issue and focuses only on the lawfulness of the traffic stop. "A lawful roadside stop by a police officer constitutes a seizure under both the Federal and New Jersey Constitutions." State v. Dunbar, 229 N.J. 521, 532 (2017).

Initially, we note, law enforcement does not need a reasonably articulable suspicion to run the license plate of any vehicle. "We have held that because MDT checks are not traditional searches subject to Fourth Amendment restrictions, they can be 'random,' that is, not based on reasonable suspicion, and thus need not be governed by predetermined objective criteria. However, MDT checks must not be based on impermissible motives such as

7

race." State v. Segars, 172 N.J. 481, 490 (2002) (internal citations omitted.) Once the MDT check resulted in no record found, Talavera's stop of the vehicle was lawful.

Ordinarily our inquiry would end here. However, because defendant contends the stop resulted from mistakes in the databases used by Talavera, we shall address the totality of the circumstances regarding the stop. "To be lawful, an automobile stop 'must be based on reasonable and articulable suspicion that an offense, including a minor traffic offense, has been or is being committed.'" State v. Bacome, 228 N.J. 94, 103 (2017) (quoting State v. Carty, 170 N.J. 632, 639-40 (2002)); see also State v. Bernokeits, 423 N.J. Super. 365, 370 (App. Div. 2011) (A "motor vehic[le] violation, no matter how minor, justifies a stop without any reasonable suspicion that the motorist has committed a crime or other unlawful act.").

The reasonable suspicion standard requires "some minimal level of objective justification for making the stop." State v. Nishina, 175 N.J. 502, 511 (2003) (quoting United States v. Sokolow, 490 U.S. 1, 7 (1989)). "[R]aw, inchoate suspicion grounded in speculation cannot be the basis for a valid stop." State v. Scriven, 226 N.J. 20, 34 (2016). "Although reasonable suspicion is a less demanding standard than probable cause, '[n]either

"inarticulate hunches" nor an arresting officer's subjective good faith can justify infringement of a citizen's constitutionally guaranteed rights.'" State v. Nyema, 249 N.J. 509, 527 (2022) (quoting State v. Stovall, 170 N.J. 346, 372 (2002) (Coleman, J., concurring in part and dissenting in part)).

"Determining whether reasonable and articulable suspicion exists . . . is a highly fact-intensive inquiry that demands evaluation of the 'totality of circumstances surrounding the police-citizen encounter, balancing the State's interest in effective law enforcement against the individual's right to be protected from unwarranted and/or overbearing police intrusions.'" Id. at 528 (quoting State v. Privott, 203 N.J. 16, 25-26 (2010)). "It is fundamental to a totality of the circumstances analysis of whether reasonable suspicion exists that courts may consider the experience and knowledge of law enforcement officers." Stovall, 170 N.J. at 363.

In assessing the totality of the circumstances for a stop based on a motor vehicle violation, a reviewing court must determine "[whether] the facts available to the officer at the moment of the seizure . . . warrant [an individual] of reasonable caution in the belief that the action taken was appropriate[.]" State v. Arthur, 149 N.J. 1, 7-8 (1997) (quoting Terry v. Ohio, 392 U.S. 1, 21-

22 (1968)). Stated differently, the stop must be lawful at the moment the seizure is initiated.

"[T]he State is not required to prove that the suspected motor vehicle violation occurred." State v. Locurto, 157 N.J. 463, 470 (1999). Rather, "[c]onstitutional precedent requires only reasonableness on the part of the police, not legal perfection. Therefore, the State only needs to prove that the police lawfully stopped the car, not that it could convict the driver of the motor-vehicle offense." State v. Williamson, 138 N.J. 302, 304 (1994); see also State v. Sutherland, 231 N.J. 429, 439 (2018).

N.J.S.A. 30:3-4 reads, in pertinent part:

> [E]very resident of this State and every nonresident whose automobile or motorcycle shall be driven in this State shall, before using the vehicle on the public highways, register the same, and an automobile or motorcycle shall not be driven unless so registered.

Defendant claims the vehicle stop was unlawful because it was premised on the information, later found to be wrong, that the car was unregistered. Therefore, the seized evidence should be suppressed. In opposition, the State argues that the stop was lawful, distinguishing errors in DMV databases from warrants, and contends that an officer has discretion in making a stop based on database information. Additionally, the State contends that even if the stop

10

was to be considered unreasonable, the evidence should be admissible since it was obtained far enough from any constitutional infraction.

Considering and applying the pertinent legal principles, we conclude the trial court correctly determined the motor vehicle stop was lawful and constitutionally permissible. Given the relatively modest threshold required for an investigatory motor vehicle stop—reasonable suspicion based on observable, articulable facts—it is clear that the State met this standard.

Talavera's stop of the vehicle was supported by several articulable and objective facts. Initially, his attention was drawn to the vehicle because it resembled a car he had previously observed that day, the driver of which he knew had a suspended license and a history of altering license plates. He also knew that the car, which frequented the area, was seen near a location associated with drug activity. Upon seeing the vehicle departing from such an area, Talavera had a legitimate investigatory basis to run the registration information through both his MDT and dispatch. Both inquiries returned "no record found" suggesting that the vehicle was either unregistered or displayed fraudulent plates—indications consistent with his prior knowledge of the suspected driver.

A-0309-23

Talavera observed the vehicle being operated on public roads, which, if unregistered, constitutes a violation of N.J.S.A. 39:3-4. During the stop, the driver was unable to produce driving credentials, and no occupant could supply registration nor insurance documentation. The record also reflects that another officer informed Talavera during the investigation that the vehicle might be registered; however, Talavera could not confirm the conflicting information personally or through dispatch. Even if the other officer statement reflected the car was indeed registered, such a possibility does not negate the reasonable suspicion Talavera developed under the totality of the circumstances.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

*M.C. Harley*

Clerk of the Appellate Division

A-0309-23